SPRIETSMA, ADMINISTRATOR OF THE ESTATE OF
SPRIETSMA, DECEASED *v.* MERCURY
MARINE, A DIVISION OF
BRUNSWICK CORP.

No. 01–706.   Argued October 15, 2002—Decided December 3, 2002

STEVENS, J., delivered the opinion for a unanimous Court.

*Leslie A. Brueckner* argued the cause for petitioner. With her on the briefs were *Arthur H. Bryant, Joseph A. Power, Jr.,* and *Todd A. Smith.*

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Acting Assistant Attorney General Katsas, Deputy Solicitor General Kneedler, Douglas N. Letter, Michael E. Robinson, Kirk K. Van Tine, Paul M. Geier, Dale C. Andrews, Peter J. Plocki, Robert F. Duncan,* and *G. Alex Weller.*

*Stephen M. Shapiro* argued the cause for respondent. With him on the brief were *Steffen N. Johnson, Michael W. McConnell, Kenneth S. Geller, Timothy S. Bishop,* and *Daniel J. Connolly.**

*Briefs of *amici curiae* urging reversal were filed for the State of Missouri et al. by *Jeremiah W. (Jay) Nixon,* Attorney General of Missouri, *James R. Layton,* State Solicitor, and *Charles W. Hatfield,* and by the

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether a state common-law tort action seeking damages from the manufacturer of an outboard motor is pre-empted either by the enactment of the Federal Boat Safety Act of 1971, 46 U. S. C. §§ 4301–4311 (FBSA, 1971 Act, or Act), or by the decision of the Coast Guard in 1990 not to promulgate a regulation requiring propeller guards on motorboats.

I

On July 10, 1995, petitioner's wife, Jeanne Sprietsma, died as a result of a boating accident on an inland lake that spans the Kentucky-Tennessee border. She was riding in an 18-foot ski boat equipped with a 115-horsepower outboard motor manufactured by respondent, Mercury Marine, which is a division of the Brunswick Corporation (Brunswick). Apparently when the boat turned, she fell overboard and was struck by the propeller, suffering fatal injuries.

---

Attorneys General for their respective States as follows: *Mark Pryor* of Arkansas, *Bill Lockyer* of California, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Earl I. Anzai* of Hawaii, *Steve Carter* of Indiana, *J. Joseph Curran, Jr.,* of Maryland, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Patricia Madrid* of New Mexico, *Roy Cooper* of North Carolina, *Hardy Myers* of Oregon, *Mark L. Shurtleff* of Utah, *Christine O. Gregoire* of Washington, and *Darrell V. McGraw, Jr.,* of West Virginia; and for the Association of Trial Lawyers of America by *Ross Diamond III* and *Jeffrey Robert White.*

Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States of America by *John G. Roberts, Jr., Catherine E. Stetson,* and *Robin S. Conrad;* for the Maritime Law Association of the United States by *Joshua S. Force, Raymond P. Hayden, William R. Dorsey III,* and *James Patrick Cooney;* for the National Association of Manufacturers et al. by *Kenneth W. Starr, Robert R. Gasaway, Richard A. Cordray, Ashley C. Parrish, Jan S. Amundson,* and *Quentin Riegel;* and for the Product Liability Advisory Council, Inc., by *Alan Untereiner.*

Petitioner filed a nine-count complaint in an Illinois court[1] seeking damages from Brunswick on state-law theories. Each count alleged that Brunswick had manufactured an unreasonably dangerous product because, among other things, the motor was not protected by a propeller guard.[2] The trial court granted respondent's motion to dismiss, and the intermediate appellate court affirmed on the ground that the action was expressly pre-empted by the FBSA. 312 Ill. App. 3d 1040, 729 N. E. 2d 45 (2000). Relying on our intervening decision in *Geier* v. *American Honda Motor Co.*, 529 U. S. 861 (2000), the Illinois Supreme Court rejected the appellate court's express pre-emption rationale, but affirmed on implied pre-emption grounds. 197 Ill. 2d 112, 757 N. E. 2d 75 (2001). The court's decision added to a split of authority on this precise issue arising from lawsuits against, among a few others, this particular respondent and its corporate subsidiaries.[3]

We granted certiorari, 534 U. S. 1112 (2002), to decide whether the FBSA pre-empts state common-law claims of

---

[1] The complaint alleges that the Sprietsmas and the owners of the boat were residents of Illinois and that the boat had been purchased in Illinois. App. 101.

[2] *Id.,* at 100–122.

[3] Compare *Lewis* v. *Brunswick Corp.*, 107 F. 3d 1494 (CA11) (finding implied pre-emption under the FBSA), cert. granted, 522 U. S. 978 (1997), cert. dismissed, 523 U. S. 1113 (1998); *Carstensen* v. *Brunswick Corp.*, 49 F. 3d 430 (CA8) (finding express pre-emption under the FBSA), cert. denied, 516 U. S. 866 (1995); and *Ryan* v. *Brunswick Corp.*, 454 Mich. 20, 557 N. W. 2d 541 (1997) (finding express pre-emption under the FBSA), with *Moore* v. *Brunswick Bowling & Billiards Corp.*, 889 S. W. 2d 246 (Tex.) (holding that federal law did not pre-empt state law in this context), cert. denied *sub nom. Vivian Industrial Plastics, Inc.* v. *Moore*, 513 U. S. 1057 (1994). See also *Lady* v. *Neal Glaser Marine, Inc.*, 228 F. 3d 598 (CA5 2000) (holding that common-law claims based on the manufacturer's failure to provide a propeller guard were impliedly pre-empted by the FBSA; Outboard Marine, the successor to Neal Glaser Marine, declared bankruptcy shortly after the petition for certiorari was filed), cert. denied *sub nom. Lady* v. *Outboard Marine Corp.*, 532 U. S. 941 (2001).

this character.[4]   Because the pre-emption defense raises a threshold issue, we have no occasion to consider the merits of petitioner's claims, or even whether the claims are viable as a matter of Illinois law.   We must, however, evaluate three distinct theories that may support the pre-emption defense: (1) that the 1971 Act expressly pre-empts common-law claims; (2) that the Coast Guard's decision not to regulate propeller guards pre-empts the claims; and (3) that the potential conflict between diverse state rules and the federal interest in a uniform system of regulation impliedly pre-empts such claims.   Before considering each of these theories, we review the history of federal regulation in this area.

## II

The 1971 Act is the most recent and most comprehensive of the several statutes that Congress has enacted to improve the safe operation of recreational boats.   A 1910 enactment required three classes of motorboats to carry certain lights, sound signals, life preservers, and fire extinguishers.   Act of June 9, 1910, 36 Stat. 462.   In 1918, Congress passed a law that required the numbering of motorboats over 16 feet long, Act of June 7, 1918, ch. 93, 40 Stat. 602, and in 1940, it reenacted the above requirements, provided a system of federal inspection, and authorized penalties for the reckless operation of motorboats, Act of Apr. 25, 1940, ch. 155, 54 Stat. 163.   In 1958, Congress enacted additional numbering requirements to be administered by the States and directed the States to compile and transmit boating accident statistics to the Secretary of the Treasury.   Federal Boating Act of 1958, 72 Stat. 1754.   Section 9 of the 1958 Act expressed a policy of encouraging uniformity of boating laws insofar as practicable.

The accident statistics compiled by the States presumably were instrumental in persuading the 1971 Congress that ad-

---

[4] Brunswick has asserted that federal maritime law governs this case. Because this argument was not raised below, it is waived.

ditional federal legislation was necessary.[5] In its statement of purposes, the FBSA recites that it was enacted "to improve boating safety," to authorize "the establishment of national construction and performance standards for boats and associated equipment," and to encourage greater "uniformity of boating laws and regulations as among the several States and the Federal Government." Pub. L. 92–75, §2, 85 Stat. 213–214. Three of the provisions implementing these goals are particularly relevant to this case.

Section 5 of the FBSA, as amended and codified in 46 U. S. C. §4302, authorizes the Secretary of Transportation to issue regulations establishing "minimum safety standards for recreational vessels and associated equipment," and requiring the installation or use of such equipment.[6] The Secretary has delegated this authority to the Coast Guard. See 49 CFR §1.46(n)(1) (1997). Before exercising that authority,

---

[5] The Senate Report on the 1971 Act observed that approximately 40 million Americans engaged in recreational boating activities every year, and that nearly 7,000 persons had died in boating accidents during the preceding 5-year period. S. Rep. No. 92–248, pp. 6–7 (1971) (hereinafter S. Rep.). The Report added: "It seems apparent that the annual loss of life is of sufficiently alarming proportion that the Federal Government should require products involved to be built to standards of safety commensurate with the risks associated with their use. Similar federal legislation exists with regard to other products, including aircraft and motor vehicles. Also, safety standards and requirements for certain categories of larger commercial vessels have existed for many years." Id., at 13.

[6] Title 46 U. S. C. §4302 provides:

"(a) The Secretary may prescribe regulations—

"(1) establishing minimum safety standards for recreational vessels and associated equipment, and establishing procedures and tests required to measure conformance with those standards, with each standard—

"(A) meeting the need for recreational vessel safety; and

"(B) being stated, insofar as practicable, in terms of performance;

"(2) requiring the installation, carrying, or use of associated equipment . . . on recreational vessels and classes of recreational vessels subject to this chapter, and prohibiting the installation, carrying, or use of associated equipment that does not conform with safety standards established under this section . . . ."

the Coast Guard must consider certain factors, such as the extent to which the proposed regulation will contribute to boating safety, and must consult with a special National Boating Safety Advisory Council appointed pursuant to § 33 of the Act, 46 U. S. C. § 13110.[7] The Advisory Council consists of 21 members, 7 representatives from each of three different groups: (1) "State officials responsible for State boating safety programs," (2) boat and equipment manufacturers, and (3) "national recreational boating organizations and . . . the general public." § 13110(b). The Coast Guard may also issue exemptions from its regulations if it determines that boating safety "will not be adversely affected." § 4305.

Section 10 of the Act, as codified in 46 U. S. C. § 4306, sets forth the Act's pre-emption clause and thus provides the basis for respondent's express pre-emption argument. It states in full:

"Unless permitted by the Secretary under section 4305 of this title, a State or political subdivision of a State may not establish, continue in effect, or enforce

---

[7] "In prescribing regulations under this section, the Secretary shall, among other things—

"(1) consider the need for and the extent to which the regulations will contribute to recreational vessel safety;

"(2) consider relevant available recreational vessel safety standards, statistics, and data, including public and private research, development, testing, and evaluation;

"(3) not compel substantial alteration of a recreational vessel or item of associated equipment that is in existence, or the construction or manufacture of which is begun before the effective date of the regulation, but subject to that limitation may require compliance or performance, to avoid a substantial risk of personal injury to the public, that the Secretary considers appropriate in relation to the degree of hazard that the compliance will correct; and

"(4) consult with the National Boating Safety Advisory Council established under section 13110 of this title about the considerations referred to in clauses (1)–(3) of this subsection."

a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment (except insofar as the State or political subdivision may, in the absence of the Secretary's disapproval, regulate the carrying or use of marine safety articles to meet uniquely hazardous conditions or circumstances within the State) that is not identical to a regulation prescribed under section 4302 of this title."

Section 40, 46 U. S. C. § 4311, sets forth the penalties that may be assessed against persons who violate the Act. At the end of that section, Congress included the following saving clause:

"Compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law." § 4311(g).

*Federal Regulation Under the FBSA*

The day after the President signed the FBSA into law, the Secretary of Transportation took action that was based on the assumption that § 10 would pre-empt existing state regulation that "is not identical to a regulation prescribed" under § 5 of the Act, even if no such federal regulation had been promulgated. On August 11, 1971, the Secretary issued a statement exempting all then-existing state laws from preemption under the Act. 36 Fed. Reg. 15764–15765. He explained that boating safety would "not be adversely affected by continuing in effect those existing laws and regulations of the various States and political subdivisions" until new federal regulations could be issued. *Id.,* at 15765.

One year later, on August 4, 1972, the Coast Guard issued its first regulations under § 5 of the Act. See 37 Fed. Reg. 15777–15785. Those regulations included boat performance and safety standards such as requirements for hull identifi-

cation numbers, maximum capacity and warnings of such capacity, and minimum boat flotation. They did not include any propeller guard requirement. After those federal regulations became effective, the Secretary limited the scope of his original blanket exemption to pre-empt those "State statutes and regulations" that concerned requirements covered by the 1972 regulations. See 38 Fed. Reg. 6914–6915 (1973). Existing state laws that regulated matters not covered by the federal regulations continued to be exempted from preemption. *Ibid.*

In the years since, the Coast Guard has promulgated a host of detailed regulations. Some prescribe the use of specified equipment, such as personal flotation devices and visual distress signals, 33 CFR pts. 175(B), (C) (2001), and certain procedures, such as compliance labeling by manufacturers and prompt accident reporting by operators, pts. 181(B), 173(C). See generally pts. 173–181. Other regulations impose precise standards governing the design and manufacture of boats themselves and of associated equipment, such as electrical and fuel systems, ventilation, and "start-in-gear protection" devices. Pt. 183; cf. *Chao* v. *Mallard Bay Drilling, Inc.*, 534 U. S. 235, 242 (2002) ("Congress has assigned a broad and important mission to the Coast Guard. . . . [T]he Coast Guard possesses authority to promulgate and enforce regulations promoting the safety of vessels . . .").

*Coast Guard Consideration of Propeller Guard Regulation*

In May 1988, the Coast Guard decided that the number of recreational boating accidents in which persons in the water were struck by propellers merited a special study.[8] Acting

---

[8] Between 1976 and 1990, the Coast Guard officially reported about 100 propeller-strike injuries in the United States per year. App. in *Lewis* v. *Brunswick*, O. T. 1997, No. 97–288, p. 170. A 1992 study by members of the Johns Hopkins University Injury Prevention Center and the Institute for Injury Reduction concluded that, when adjusted for underreporting,

at the request of the Coast Guard, the National Boating Safety Advisory Council appointed a special Propeller Guard Subcommittee. The subcommittee was directed to review "the available data on the prevention of propeller-strike accidents" and to study the "various methods of shrouding propellers to prevent contact with [a] person in the water." App. 43.

After 18 months of study, the subcommittee recommended that the Coast Guard "should take no regulatory action to require propeller guards." *Id.*, at 40. Its recommendation rested upon findings that, given current technology, feasible propeller guards might prevent penetrating injuries but increase the potential for blunt trauma caused by collision with the guard, which enlarges the boat's underwater profile; feasible models would cause power and speed loss at higher speeds; and it would be "prohibitive[ly]" expensive to retrofit all existing boats with propeller guards because "[n]o simple universal design suitable for all boats and motors in existence" had been proved feasible. *Id.*, at 36–38.

The Advisory Council endorsed the subcommittee's recommendation, as did the Coast Guard. In a 1990 letter to the Council, the Chief of the Coast Guard's Office of Navigation Safety and Waterway Services agreed that the available accident data did not support the adoption of a regulation requiring propeller guards on motorboats, but stated that the Coast Guard would continue to review information "regarding development and testing of new propeller guarding devices or other information on the state of the art." *Id.*, at 81. In 1995, 1996, and 1997, the Coast Guard invited public comment on various proposals to reduce the number of injuries involving propeller strikes.

In April 2001, the Advisory Council recommended that the Coast Guard develop four specific regulations. See 66 Fed.

"the true number of propeller injuries and fatalities may be closer to . . . 2,000–3,000 per year." *Id.*, at 199.

Reg. 63645, 63647.[9] In response, in December 2001, the Coast Guard published a notice of proposed rulemaking addressing one of the recommendations. The proposed rule, if adopted, would require an owner of a nonplaning houseboat for rent to equip her vessel with either a propeller guard or "a combination of three propeller injury avoidance measures." *Ibid.* The Advisory Council also recommended that the Coast Guard require "manufacturers and importers of new planing vessels 12 feet to 26 feet in length with propellers aft of the transom to select and install one of several factory installed propeller injury avoidance methods." *Ibid.* Although the Coast Guard has indicated that this recommendation, along with the Advisory Council's other recommendations, will be addressed in "subsequent regulatory projects," *ibid.,* it has not yet issued any regulation either requiring or prohibiting propeller guards on recreational planing vessels such as the boat involved in this case.

## III

Because the FBSA contains an express pre-emption clause, our "task of statutory construction must in the first instance focus on the plain wording of the clause, which nec-

---

[9] "After discussing the alternatives and their cost, the Council recommended that the Coast Guard . . . develop four specific regulations:

"(1) Require owners of all propeller driven vessels 12 feet in length and longer with propellers aft of the transom to display propeller warning labels and to employ an emergency cut-off switch, where installed;

"(2) Require manufacturers and importers of new planing vessels 12 feet to 26 feet in length with propellers aft of the transom to select and install one of several factory installed propeller injury avoidance methods;

"(3) Require manufacturers and importers of new non-planing vessels 12 feet in length and longer with propellers aft of the transom to select and install one of several factory installed propeller injury avoidance methods; and

"(4) Require owners of all non-planing rental boats with propellers aft of the transom to install either a jet propulsion system or a propeller guard or all of several propeller injury avoidance measures." 66 Fed. Reg., at 63647.

essarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc.* v. *Easterwood,* 507 U. S. 658, 664 (1993). Here, the express pre-emption clause in § 10 applies to "a [state or local] law or regulation." 46 U. S. C. § 4306. We think that this language is most naturally read as not encompassing common-law claims for two reasons. First, the article "a" before "law or regulation" implies a discreteness—which is embodied in statutes and regulations—that is not present in the common law. Second, because "a word is known by the company it keeps," *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 575 (1995), the terms "law" and "regulation" used together in the pre-emption clause indicate that Congress pre-empted only positive enactments. If "law" were read broadly so as to include the common law, it might also be interpreted to include regulations, which would render the express reference to "regulation" in the pre-emption clause superfluous.

The Act's saving clause buttresses this conclusion. See *Geier* v. *American Honda Motor Co.,* 529 U. S., at 867–868. It states that "[c]ompliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law." § 4311(g). As we held in *Geier,* the "saving clause assumes that there are some significant number of common-law liability cases to save [and t]he language of the pre-emption provision permits a narrow reading that excludes common-law actions." *Id.,* at 868.

The saving clause is also relevant for an independent reason. The contrast between its general reference to "liability at common law" and the more specific and detailed description of what is pre-empted by § 10—including the exception for state regulations addressing "uniquely hazardous conditions"—indicates that § 10 was drafted to pre-empt performance standards and equipment requirements imposed by statute or regulation.

Our interpretation of the statute's language does not produce anomalous results. It would have been perfectly rational for Congress not to pre-empt common-law claims, which—unlike most administrative and legislative regulations—necessarily perform an important remedial role in compensating accident victims. Cf. *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 251 (1984). Indeed, compensation is the manifest object of the saving clause, which focuses not on state authority to regulate, but on preserving "liability at common law or under State law." In context, this phrase surely refers to private damages remedies.[10] We thus agree with the Illinois Supreme Court's conclusion that petitioner's common-law tort claims are not expressly pre-empted by the FBSA.

IV

Even if § 10 of the FBSA does not expressly pre-empt state common-law claims, respondent contends that such claims are implicitly pre-empted by the entire statute, and more specifically by the Coast Guard's decision not to regulate propeller guards. Both are viable pre-emption theories:

> "We have recognized that a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, *English* v. *General Elec. Co.*, 496 U. S. 72, 78–79 (1990), or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where it is 'impossible for a private party to comply with both state and federal requirements,' *id.*, at 79, or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines* v. *Davidowitz*, 312 U. S.

---

[10] The FBSA itself imposes civil money penalties payable to the United States, as well as imprisonment for willful violations, 46 U. S. C. § 4311, but does not authorize any private damages remedies for persons injured by noncomplying operators, boats, or equipment.

52, 67 (1941)." *Freightliner Corp.* v. *Myrick*, 514 U. S. 280, 287 (1995).

Moreover, Congress' inclusion of an express pre-emption clause "does *not* bar the ordinary working of conflict pre-emption principles," *Geier*, 529 U. S., at 869 (emphasis in original), that find implied pre-emption "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp.*, 514 U. S., at 287 (internal quotation marks and citations omitted). We are not persuaded, however, that the FBSA has any such pre-emptive effect.

We first consider, and reject, respondent's reliance on the Coast Guard's decision not to adopt a regulation requiring propeller guards on motorboats. It is quite wrong to view that decision as the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation. The decision in 1990 to accept the subcommittee's recommendation to "take no regulatory action," App. 80, left the law applicable to propeller guards exactly the same as it had been before the subcommittee began its investigation. Of course, if a state common-law claim directly conflicted with a federal regulation promulgated under the Act, or if it were impossible to comply with any such regulation without incurring liability under state common law, pre-emption would occur. This, however, is not such a case.

Indeed, history teaches us that a Coast Guard decision not to regulate a particular aspect of boating safety is fully consistent with an intent to preserve state regulatory authority pending the adoption of specific federal standards. That was the course the Coast Guard followed in 1971 immediately after the Act was passed, and again when it imposed its first regulations in 1972 and 1973. The Coast Guard has never taken the position that the litigation of state common-law

claims relating to an area not yet subject to federal regulation would conflict with "the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941).

The Illinois Supreme Court concluded "that the Coast Guard's failure to promulgate a propeller guard requirement here equates to a ruling that no such regulation is appropriate pursuant to the policy of the FBSA." 197 Ill. 2d, at 128, 757 N. E. 2d, at 85. With regard to policies defined by Congress, we have recognized that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate." *Arkansas Elec. Cooperative Corp.* v. *Arkansas Pub. Serv. Comm'n*, 461 U. S. 375, 384 (1983); see also *Bethlehem Steel Co.* v. *New York State Labor Relations Bd.*, 330 U. S. 767, 774 (1947) (state law is pre-empted "where failure of the federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute"). In this instance, however, the Illinois Supreme Court's conclusion does not accurately reflect the Coast Guard's entire explanation for its decision:

> "The regulatory process is very structured and stringent regarding justification. Available propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats. Regulatory action is also limited by the many questions about whether a universally acceptable propeller guard is available or technically feasible in all modes of boat operation. Additionally, the question of retrofitting millions of boats would certainly be a major economic consideration." App. 80.

This statement reveals only a judgment that the available data did not meet the FBSA's "stringent" criteria for federal

regulation. The Coast Guard did not take the further step of deciding that, as a matter of policy, the States and their political subdivisions should not impose some version of propeller guard regulation, and it most definitely did not reject propeller guards as unsafe.[11] The Coast Guard's apparent focus was on the lack of any "universally acceptable" propeller guard for "all modes of boat operation." But nothing in its official explanation would be inconsistent with a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular kind of boat equipped with respondent's particular type of motor. Thus, although the Coast Guard's decision not to require propeller guards was undoubtedly intentional and carefully considered, it does not convey an "authoritative" message of a federal policy against propeller guards. And nothing in the Coast Guard's recent regulatory activities alters this conclusion.

The Coast Guard's decision *not* to impose a propeller guard requirement presents a sharp contrast to the decision of the Secretary of Transportation that was given pre-emptive effect in *Geier* v. *American Honda Motor Co.*, 529 U. S. 861 (2000). As the Solicitor General had argued in that case, the promulgation of Federal Motor Vehicle Safety Standard (FMVSS) 208 embodied an affirmative "policy judgment that safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car." *Id.*, at 881. In finding pre-emption, we expressly placed "weight upon the DOT's interpretation of FMVSS 208's objectives and its conclusion, as set forth in the Government's brief, that a tort suit such as this one would ' " 'stan[d] as an obstacle to the accomplish-

---

[11] Indeed, in response to the Propeller Guard Subcommittee's recommendation in favor of "educational and awareness campaigns," the Coast Guard indicated that it would publish a series of articles "aimed at avoiding boat/propeller strike accidents," which could include the topic of "available propeller guards." App. 82–83.

ment and execution'"' of those objectives . . . . Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive. The agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements." *Id.*, at 883. In the case before us today, the Solicitor General, joined by counsel for the Coast Guard, has informed us that the agency does not view the 1990 refusal to regulate or any subsequent regulatory actions by the Coast Guard as having any pre-emptive effect. Our reasoning in *Geier* therefore provides strong support for petitioner's submission.

V

Even though the refusal to regulate propeller guards in 1990 had no pre-emptive effect, it is possible that the statutory scheme as a whole implicitly pre-empted common-law claims such as petitioner's when it was enacted in 1971. If that were so, the exemption carried forward by the Secretary in 1973 after the first federal regulations were adopted might have saved existing state common-law rules "in effect on the effective date" of the 1971 Act, so far as those rules relate to propeller guards. 38 Fed. Reg., at 6915. But even if that is not the case, we think it clear that the FBSA did not so completely occupy the field of safety regulation of recreational boats as to foreclose state common-law remedies.

In *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151 (1978), we considered a federal statute that directed the Secretary of Transportation to determine "which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States," and after inspection to certify "each vessel as sufficiently safe to protect the marine environment." *Id.*, at 163, 165. We held that this scheme of mandatory federal regulation implicitly pre-empted the power of the State of Washington "to exclude from Puget Sound ves-

sels certified by the Secretary as having acceptable design characteristics, unless they satisfy the different and higher design requirements imposed by state law." *Id.*, at 165. As we explained in *United States* v. *Locke*, 529 U. S. 89 (2000), the analysis in *Ray* was governed by field-pre-emption rules because the rules at issue were in a "field re-served for federal regulation" and "Congress ha[d] left no room for state regulation of these matters." 529 U. S., at 111. In particular, Title II of the Ports and Waterways Safety Act of 1972 (PWSA) *required* the Secretary to issue "such rules and regulations as may be necessary with re-spect to the design, construction, and operation of the cov-ered vessels." 435 U. S., at 161.

The Illinois Supreme Court relied on both *Ray* and *Locke* to find petitioner's claims impliedly pre-empted. But the FBSA, unlike Title II of the PWSA, does not *require* the Coast Guard to promulgate comprehensive regulations cov-ering every aspect of recreational boat safety and design; nor must the Coast Guard certify the acceptability of every recreational boat subject to its jurisdiction. Moreover, nei-ther Title II of the PWSA nor the holding in either *Ray* or *Locke* purported to pre-empt possible common-law claims, whereas the FBSA expressly preserves such claims.

The FBSA might be interpreted as expressly occupying the field with respect to state positive laws and regulations but its structure and framework do not convey a "clear and manifest" intent, *English* v. *General Elec. Co.*, 496 U. S. 72, 79 (1990) (internal quotation marks and citations omitted), to go even further and implicitly pre-empt all state common law relating to boat manufacture. Rather, our conclusion that the Act's express pre-emption clause does not cover common-law claims suggests the opposite intent. See *Ci-pollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 517 (1992); *id.*, at 547 (SCALIA, J., concurring in judgment in part and dis-senting in part). Nor is a clear and manifest intent to sweep away state common law established by an unembellished

statement in a House Report that the 1971 Act "preempts the field on boating standards or regulations." H. R. Rep. No. 92–324, p. 11 (1971). The statement was made prior to the amendment containing the saving clause, and nothing in the entire report suggests that it meant the occupied "field" to include judge-made common law.

Respondent ultimately relies upon one of the FBSA's main goals: fostering uniformity in manufacturing regulations. Uniformity is undoubtedly important to the industry, and the statute's pre-emption clause was meant to "assur[e] that manufacture for the domestic trade will not involve compliance with widely varying local requirements." S. Rep. 20. Yet this interest is not unyielding, as is demonstrated both by the Coast Guard's early grants of broad exemptions for state regulations and by the position it has taken in this litigation. Absent a contrary decision by the Coast Guard, the concern with uniformity does not justify the displacement of state common-law remedies that compensate accident victims and their families and that serve the Act's more prominent objective, emphasized by its title, of promoting boating safety.

The judgment of the Illinois Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*