PRESENT:  Powell, Kelsey, McCullough, Chafin, Russell, and Mann, JJ., and Mims, S.J.

APPALACHIAN VOICES

v.  Record No. 220130

OPINION BY
JUSTICE D. ARTHUR KELSEY
OCTOBER 27, 2022

STATE CORPORATION COMMISSION, ET AL.

FROM THE STATE CORPORATION COMMISSION

Appalachian Voices, a nonprofit environmental organization, appeals an order of the

State Corporation Commission ("SCC") that approved a petition by Virginia Electric and Power

Company ("VEPCO") to obtain a rate-adjustment clause pursuant to Code § 56-585.1(A)(5)(e).

VEPCO made the request to recover projected costs of purchasing allowances through the

Regional Greenhouse Gas Initiative ("RGGI"), a cap-and-trade market regulating $CO_2$ emissions

by electric utilities.  Appalachian Voices argues that the SCC failed to apply the proper legal

standard governing such requests.  We disagree and affirm the Commission's judgment.

I.

In 2019, the Virginia Department of Environmental Quality ("DEQ") issued a series of

regulations establishing a "$CO_2$ Budget Trading Program," which were subsequently amended

and became effective in 2020.  9 VAC §§ 5-140-6010 to -6440.  The General Assembly

authorized Virginia's participation in RGGI and implementation of the $CO_2$ Budget Trading

Program regulations with the 2020 enactment of the Clean Energy and Community Flood

Preparedness Act, Code §§ 10.1-1329 to -1331.  The DEQ's final regulations directed that

Virginia's participation in RGGI would begin on January 1, 2021.  *See* 9 VAC § 5-140-6020.

Though highly complex in its details, the $CO_2$ Budget Trading Program relies on a basic

economic thesis:  $CO_2$ emissions can be reduced over time by making those responsible for them

pay for the right to emit.  Rather than directly ordering electric utilities to lower $CO_2$ emissions

from their power plants, the regulations create an artificial market for the right to emit $CO_2$. In this market, electric utilities must purchase a fungible "allowance" for every short ton of $CO_2$ emissions their power plants emit. The market then progressively reduces the supply of allowances, *see* 9 VAC § 5-140-6190, which necessarily increases their price. The purchasing utility then passes on those costs — estimated to be approximately $2.95 billion through 2045, J.A. at 165, 178 — to Virginia ratepayers. The goal of this program is to reduce $CO_2$ emissions within a specified timeframe in a planned and predictable way.

RGGI, Inc., a multi-state consortium, operates the $CO_2$-allowance marketplace. The governing body of RGGI, Inc. consists of two representatives from each of the participating states.[1] After establishing a regional cap on $CO_2$ emissions, RGGI, Inc. sells $CO_2$ allowances at quarterly auctions and authorizes participating bidders to trade or resell allowances in a secondary market. *See id.* at 19-21. Each participating state starts off with a bank of allowances in proportion to its share of the regional cap. *See id.* at 20; 9 VAC § 5-140-6210(A). In Virginia, electric utilities with power plants having outputs of 25 megawatts or greater must purchase allowances for every short ton of $CO_2$ emissions the plants produce. 9 VAC §§ 5-140-6040(A), -6050(C). Electric utilities may obtain the allowances at quarterly RGGI auctions or by later trading with or buying from other participating utilities. J.A. at 19-20.

In November 2020, pursuant to Code § 56-585.1(A)(5)(e), VEPCO filed a petition seeking the SCC's approval of a rate-adjustment clause ("RGGI Rider") that would amend the governing tariff for the rate year August 1, 2021, to July 31, 2022, to recover the utility's projected costs for purchasing $CO_2$ emission allowances from January 1, 2021, to July 31, 2022.

---

[1] The Commonwealth presently has two representatives on the RGGI Board of Directors: Jehmal T. Hudson, a sitting SCC Commissioner, and Michael Rolband, the Director of DEQ.

VEPCO's plan estimated that it would need to purchase approximately 19 million $CO_2$ allowances per year or approximately 29 million $CO_2$ allowances by July 31, 2022, at the cost of approximately $168 million, to cover the estimated emissions from its Virginia-based power plants.  An additional "bank of allowances" would be purchased to protect electricity customers from short-term volatility of the allowance prices.  J.A. at 8.  In November 2021, the SCC approved VEPCO's RGGI-Rider petition over the objection of Appalachian Voices.

II.

On appeal, Appalachian Voices argues that the SCC failed to apply the law when it approved VEPCO's RGGI-Rider petition.  Though this high-stakes contest takes place in a factually complicated setting, the appellate argument ultimately turns on a single word: *necessary*.  A regulated utility may seek a rate-adjustment clause to recover, among other things,

> [p]rojected and actual costs that the Commission finds to be *necessary* . . . to comply with state or federal environmental laws or regulations . . . including the costs of all allowances purchased through a market-based trading program for carbon dioxide emissions.  The Commission shall approve such a petition if it finds that such costs are *necessary* to comply with such environmental laws or regulations.

Code § 56-585.1(A)(5)(e) (emphases added).

Appalachian Voices claims that the SCC never specifically found that VEPCO's costs were necessary to comply with the DEQ's promulgated RGGI regulations.  In response, the SCC points to multiple places in its final order stating that the challenged costs satisfy all applicable statutory requirements — necessity being one of them.[2]  Maybe so, Appalachian Voices

---

[2] The SCC's order approving the RGGI Rider cites Code § 56-585.1(A)(5)(e) several times, J.A. at 469-70, 474-75, and incorporates by reference its hearing examiner's report, *see id.* at 475, which also cites Code § 56-585.1(A)(5)(e) multiple times and quotes subsection (e) twice.  Those references run throughout the hearing examiner's report, from the introduction to the summary of the evidence, the analysis, and the conclusion.

responds, but the SCC made no factual findings to demonstrate the necessity for the rate-adjustment clause sought by VEPCO. For this reason, Appalachian Voices contends that we should remand the case to the SCC to make factual findings using the necessity standard that Appalachian Voices believes the legislature intended.

Under the view of Appalachian Voices, only the *lowest* possible allowance costs are "necessary" costs. Put more simply, Appalachian Voices seems to ask, "Why is it necessary to pay more than you have to?" The whole point of the new statutory language and regulations, Appalachian Voices correctly observes, is to reduce $CO_2$ emissions by making it gradually more expensive to buy a shrinking supply of $CO_2$ allowances. Because the SCC did not press VEPCO to study and eventually execute a plan to throttle back its $CO_2$ emissions from existing power plants, Appalachian Voices concludes that the SCC did not apply the correct statutory standard of necessity for recovering the costs of the RGGI allowances.

While the argument has a persuasive tenor, there is no statutory or regulatory text supporting it. Too much of the argument has been baked into a single word considered in the abstract. It is true that Code § 56-585.1(A)(5)(e) requires the compliance costs to be "necessary" in addition to being "reasonable[] or pruden[t]" under Code § 56-585.1(D). And, in ordinary language, these subtly different benchmarks are related but not identical. Something can be reasonable and prudent yet unnecessary. But it is hard to imagine something being necessary and yet unreasonable and imprudent. This linguistic tangle is not new to the law. As Chief Justice John Marshall famously said:

> The word "necessary" . . . has not a fixed character, peculiar to itself. It admits of all degrees of comparison; and is often connected with other words, which increase or diminish the impression the mind receives of the urgency it imports. A thing may be necessary, very necessary, absolutely or indispensably

4

> necessary. To no mind would the same idea be conveyed by these several phrases.

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 414 (1819). Whatever the degree of essentiality the adjective "necessary" has, it must be related to "some purpose or reason." Black's Law Dictionary 1241 (11th ed. 2019). To understand the intended range of a modifier, therefore, we must consider the thing or idea being modified.

When applying these principles to statutory words with no "fixed character," *McCulloch*, 17 U.S. at 414, we test which of the competing interpretations best fits within the larger legislative context. In doing so, however, we do not ask "what the legislature intended to enact, but what is the meaning of that which it did enact. We must determine the legislative intent by what the statute says and not by what we think it should have said." *Carter v. Nelms*, 204 Va. 338, 346 (1963); *see also* Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899). The context we examine, therefore, does not involve speculations about extra-textual notions of public policy. We look instead at clear textual clues to the meaning of an otherwise unclear text — hence the maxim: "In legal codes, as in ordinary conversation, 'a word is known by the company it keeps.'" *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 278 (2016) (quoting *Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2002)).

In this case, the necessity standard keeps very close company. Code § 56-585.1(A)(5)(e) requires the SCC to determine whether the utility's costs were "necessary to comply with such environmental laws or regulations." It is thus the necessity to *comply* with applicable laws or regulations that matters. The most applicable law here is the DEQ regulation requiring VEPCO to incur the costs of purchasing $CO_2$ allowances. *See* 9 VAC § 5-140-6050(C). VEPCO did just that. It estimated the actual number of allowances its emission-output formula predicted and

5

projected the costs of purchasing those allowances at the RGGI quarterly auctions or the secondary market, along with a contingency account of allowances if the estimate later proved to be too low.[3]  The costs are recoverable, therefore, because they were necessary to comply with VEPCO's statutory duty to purchase allowances for every short ton of $CO_2$ emitted from its power plants.  In an enactment clause in the Clean Energy and Community Flood Preparedness Act, the General Assembly said as much:  "[T]he costs of allowances purchased through a market-based trading program . . . are *deemed* to constitute environmental compliance project costs that may be recovered" by the utility pursuant to Code § 56-585.1(A)(5)(e).  *See* 2020 Acts chs. 1219, 1280, enactment cl. 2, at 2687, 3150-51 (emphasis added); *see also* J.A. at 417-19.

This understanding of the necessity standard takes into account VEPCO's statutory duty to provide a stable and reliable power grid for all Virginians.  That is not simply an aspirational goal.  It is an underlying condition of VEPCO's status as a legal monopoly and a nonnegotiable limitation on the permissible enforcement of the General Assembly's environmental goals.[4]

---

[3] In its petition, VEPCO stated that it would "seek to maintain a bank of allowances" (between 10% to 20% of the anticipated annual requirement), J.A. at 8, "to protect customers from forecast uncertainty, price volatility, and noncompliance penalties," *id.* at 333.  At the evidentiary hearing, VEPCO presented evidence regarding the difficulties associated with predicting future $CO_2$ emissions and gave examples of monthly emissions that deviated significantly higher than the initial forecasts.  *See id.* at 328.  The SCC showed no concern over VEPCO's banking plan, no doubt given the harsh penalties that would arise if VEPCO guessed too low on the forecasted $CO_2$ emissions.  At the end of the "control period," the utility must purchase three allowances for each short ton of $CO_2$ emissions not covered by a prepurchased allowance.  *See* 9 VAC § 5-140-6260(D)(1).  The banked allowances ameliorated the risk of incurring this penalty.

[4] *See, e.g.*, 2020 Acts ch. 1193, enactment cl. 9, at 2526 (stating that "nothing in [the Virginia Clean Economy Act] shall require the utilities or the State Corporation Commission to take any action that, in the State Corporation Commission's discretion and after consideration of all in-state and regional transmission entity resources, threatens the reliability or security of electric service to the utility's customers"); Code § 56-585.5(B)(4) (authorizing a utility to "petition the Commission for relief from the requirements of this subsection on the basis that the requirement would threaten the reliability or security of electric service to customers").

VEPCO fulfills this duty in part by participating in the PJM Interconnection Market — a "regional transmission entity," Code §§ 56-577(A)(1), -579(A), that supports a host of legislative goals including "ensuring that consumers' needs for economic and reliable transmission are met," Code § 56-579(A)(2)(a)(2)(d), and maintaining "reliability over the long term to promote efficient use of the grid," 20 VAC § 5-320-40(2). In its review of this case, the SCC properly factored in VEPCO's commitment to continue operating its existing power units in support of the electrical grid managed by the PJM Interconnection Market. *See* J.A. at 413, 416, 424. That commitment preexisted Virginia's entry into the RGGI and was required until at least June 2022. *Id.* at 413, 424.

Appalachian Voices says this line of reasoning misses the whole point of the RGGI scheme because VEPCO would have needed far fewer allowances if it had simply reduced its $CO_2$ emissions by limiting output from emitting power plants. We need not examine the factual basis for this assertion[5] because we disagree with its relevance in this context. The RGGI scheme has as its aim specific reductions in $CO_2$ emissions by specific target dates. *See* 9 VAC § 5-140-6190 (setting forth decreasing $CO_2$ allowance budgets annually through 2030). The required purchase of allowances fits within this market-based model. As the number of available allowances steadily falls, their prices steadily rise. The goal is to make it uneconomical for

---

[5] The SCC was skeptical of this assertion. "[W]hile the proposed Rider RGGI revenue requirement is a function of allowance quantities *and* prices," the SCC hearing examiner found, "lower emissions would not necessarily support a lower revenue requirement." J.A. at 422 (emphasis in original). The hearing examiner then pointed to VEPCO's updated modeling at the time of the hearing: "The results of the updated modeling run show higher costs attributable to forecasted emissions in April 2021-July 2022 even though forecasted emissions decreased during these months. This illustrates that, mathematically, additional costs from higher forecasted RGGI prices can exceed allowance savings associated with lower forecasted emissions." *Id.* (footnote omitted).

power plants to emit $CO_2$ while at the same time redirecting the funds collected by RGGI

through the sale of allowances to support, among other things, the production of clean and

renewable energy. Consistent with this stratagem, the General Assembly authorizes the utility to

recover the "necessary" costs of complying with and participating in this "market-based trading

program for carbon dioxide emissions." Code § 56-585.1(A)(5)(e).[6] In this manner, RGGI's

market-based model of indirect coercion supplements the SCC's express authority to exercise

direct coercion on electric utilities to reduce $CO_2$ emissions.

Before issuing its ruling in the present case, another important SCC proceeding had taken

place. In April 2021, the SCC reviewed VEPCO's initial plans to satisfy the recently enacted

Virginia Clean Economy Act ("VCEA"), *see generally* Code § 56-585.5. The VCEA requires

electric utilities to fully retire carbon-emitting power plants by dates certain, specifies

percentages of renewable energy that electric utilities should procure by dates certain, and

requires utilities to participate in a "renewable energy portfolio standard program," or "RPS

Program," that sets annual goals for the sale of renewable energy. *See* Code § 56-585.5(B)-(C).

The SCC approved VEPCO's initial RPS plan with the caveat that future VCEA annual

reports must include an integrated least-cost plan that protects the reliability of energy supplies

while reasonably addressing all relevant carbon-reduction legal requirements. *See Ex Parte:*

*Establishing 2020 RPS Proceeding for Va. Elec. and Power Co.*, Case No. PUR-2020-00134,

2021 WL 1820791, at \*4-5 (Va. S.C.C. Apr. 30, 2021). It will be in these future VCEA

---

[6] The "necessary" costs approved by the SCC were projected costs because VEPCO's petition sought the RGGI Rider to cover the compliance costs incurred from the inception of the RGGI program on January 1, 2021, until July 31, 2022. As the hearing examiner pointed out, the estimated costs may not ultimately be realized and "can be trued-up when forecasted prices are reconciled with actual prices in future Rider RGGI proceedings." J.A. at 420.

proceedings, not the present RGGI-Rider case, that the SCC will begin to address specific timetables for scaling back and ultimately retiring power plants that emit $CO_2$. The SCC's order in the present case accurately explained the interplay between the indirect-RGGI and the direct-VCEA legislative schemes:

> [T]he Commission recognizes that [VEPCO's] RGGI compliance is not isolated from its RPS plans, which are also required by statute. Indeed, in [VEPCO's] recent [VCEA] proceeding, the Commission expressly directed the Company to include in future [VCEA] filings a least-cost plan that meets applicable carbon regulations, including Virginia's participation in RGGI. Similarly, we herein direct the Company to include in future Rider RGGI filings an analysis of how its RGGI compliance corresponds to its RPS plan filings.

J.A. at 474-75. This decisional sequencing is consistent with the statutory framework. An integrated least-cost plan will be forged in the VCEA proceedings that approve VEPCO's annual RPS plans and thereafter will be applied by the SCC in its review of any subsequent RGGI-Rider petitions. Asking the SCC in the present case to predetermine how it would rule on VEPCO's least-cost plans in future VCEA proceedings puts the cart before the horse.

### III.

In sum, the SCC did not misunderstand or fail to apply the legal standard governing RGGI-Rider petitions filed pursuant to Code § 56-585.1(A)(5)(e). The opportunity for Appalachian Voices to advocate for its ideal, least-cost program for reducing $CO_2$ emissions from VEPCO's power plants will occur when the SCC reviews VEPCO's subsequent plans to satisfy the RPS Program required by the VCEA.

*Affirmed.*

9