# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

STEFANSKI v SAGINAW COUNTY 911 COMMUNICATIONS CENTER AUTHORITY

Docket No. 166663. Argued on application for leave to appeal January 22, 2025. Decided April 14, 2025.

James Stefanski brought an action in the Saginaw Circuit Court against his former employer, Saginaw County 911 Communications Center Authority, alleging that defendant violated MCL 15.362 of the Whistleblowers' Protection Act (the WPA), MCL 15.361 *et seq*., when defendant constructively discharged plaintiff in retaliation for his report to defendant's director that a supervisor's actions constituted gross negligence. One night, a supervisor answered a 911 call; the caller reported hearing gunshots and reported that she believed someone had been shot. The supervisor coded the call as "1010J," meaning that shots had been fired. Under this code, emergency medical services are not dispatched to the scene. A woman at the scene had in fact been shot, and she later died from her injuries. Plaintiff believed that his supervisor should have coded the call as "40J," which would have indicated that someone had been shot and required that emergency medical services be dispatched to the scene. Plaintiff discussed this matter with defendant's director, who believed that the supervisor had made a judgment call and did not question the supervisor's decision. Plaintiff missed several days of work in the weeks that followed. After receiving two notices for his nonscheduled absences (NSAs), plaintiff initiated another conversation with the director, allegedly explaining that he was having medical issues because of the stress of his supervisor's improper coding of the 911 call, the supervisor's gross negligence, and how this matter had been handled. Following this conversation, plaintiff alleged that he had been treated differently at work. Plaintiff went on a medical leave of absence and was given a return-to-work date; however, plaintiff called off sick for his first two shifts following the return-to-work date. The director then called plaintiff and told him not to report for his upcoming shift. The director later called plaintiff for a disciplinary hearing to discuss his whereabouts on the days he called off work. Plaintiff received a letter indicating that he was being suspended because of his NSAs. Believing this reason was pretextual, plaintiff resigned and filed this suit. Defendant moved for summary disposition, arguing that plaintiff did not engage in an activity protected by the WPA because gross negligence is not a violation of a law or regulation or rule promulgated pursuant to law. Defendant further argued that even if a report of gross negligence were actionable under the WPA, plaintiff did not make a report or a threat to report under the WPA because he did not indicate that his supervisor's conduct violated a law, he did not report any hidden violation of the law, and he did not make a charge of illegality. The trial court, Manvel Trice III, J., granted summary disposition to defendant, concluding that reporting an employee's

perceived negligence or gross negligence—a violation of the common law—was not a protected activity under the WPA. Plaintiff appealed, and in an unpublished per curiam opinion issued on January 4, 2024 (Docket No. 364851), the Court of Appeals, RIORDAN, P.J., and M. J. KELLY, J. (MURRAY, J., concurring), affirmed the trial court's ruling. The Court of Appeals relied on *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519 (2014), which held that a plaintiff's report of malpractice did not fall under the WPA, to conclude that reporting a violation of the common law is not a protected activity under the WPA. Accordingly, the Court of Appeals held that plaintiff was not engaging in a protected activity when he allegedly reported his supervisor's gross negligence. Plaintiff sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on the application. ___ Mich ___ (2024).

In an opinion by Chief Justice CLEMENT, joined by Justices BERNSTEIN, CAVANAGH, WELCH, BOLDEN, and THOMAS, the Supreme Court, in lieu of granting leave to appeal, *held*:

To receive protection under MCL 15.362 of the WPA, an employee must report a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body. The term "law" as used in the statutory phrase "a violation or a suspected violation of a law" encompasses the common law.

1. The purpose of the WPA is protection of the public, and the WPA furthers this goal by protecting employees who report a violation or suspected violation of state, local, or federal law. Among other things, the WPA makes it illegal for an employer to retaliate against an employee because the employee has reported a violation of a law. Courts must construe the WPA liberally to effectuate its purpose of protecting whistleblowers. MCL 15.362 of the WPA provides that an employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, *reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body*, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. To establish a prima facie case under MCL 15.362, a plaintiff need only show that (1) they were engaged in protected activity as defined by the WPA, (2) they suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. Protected activity includes (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation.

2. The WPA does not define "law." When a statutory definition is absent, a court consults dictionary definitions to determine a word's plain and ordinary meaning. The term "common law" fits within the meaning of "law" found in lay dictionaries and is sometimes expressly included in that definition. And even if "law" is considered a term of art, the common law is also included in the legal meaning of "law" as defined in *Black's Law Dictionary* because it is a body of rules that is developed by the judiciary, which is a controlling authority, and it has binding legal force. Further, because MCL 15.362 does not limit or modify the word "law," excluding common law from MCL 15.362 would impose a limiting barrier that is not found in the statute. Accordingly,

the word "law" in MCL 15.362 includes the common law. The Court of Appeals' judgment was reversed in this regard.

3. Because an employee must report a violation of "a" law and not just a violation of law, a plaintiff may not simply report a violation of law generally. Although the common law falls under the definition of "law," to receive the WPA's protections, a plaintiff must show that the reported violation was, in fact, a violation of "a" law. Resolution of this issue requires a determination of whether gross negligence is, in and of itself, "a" law that can be, and was, violated. The Court of Appeals did not previously address this issue, so this issue had to be remanded to the Court of Appeals for resolution.

4. To receive protection under the WPA, a plaintiff must show that they, in fact, made a report or must show by clear and convincing evidence that they were about to make a report; the WPA does not protect employees who merely discuss reporting a violation without taking further action. Neither the trial court nor the Court of Appeals determined whether plaintiff's actions constituted a report or otherwise demonstrated that he was about to make a report under the WPA. The lower courts' decisions relied on the conclusion that reporting a violation or suspected violation of the common law is not a protected activity under the WPA, so the lower courts did not reach this issue. Accordingly, this issue had to be remanded to the Court of Appeals for it to resolve whether plaintiff satisfied this required element of his claim.

Reversed and remanded to the Court of Appeals for consideration of whether gross negligence is a violation of "a" law and whether plaintiff's conduct constituted a report under MCL 15.362.

Justice ZAHRA, dissenting, would have held that common law is not "a law" under the WPA. He stated that the majority opinion cherry-picked the word "law" from the WPA and defined it in isolation from the statutory text. The majority opinion also cherry-picked the phrase "common law" from the definitions of "law" in various dictionaries without considering the statutory language surrounding the word "law" that not only refers to a violation of "a law" but also violations of a "regulation" or a "rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States . . . ." These specific violations, when used together, indicated that the Legislature was referring to only positive enactments of law rather than the common law. The majority opinion ran afoul of two applicable canons of statutory construction: the surplusage canon and the associated-words canon. Applying those two canons, a violation or suspected violation of "a law" under MCL 15.362 refers to a violation or suspected violation of a statute, administrative rule, and perhaps a constitutional provision, but not the common law. The majority opinion's expansive interpretation of the word "law" duplicated the phrase "regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States" in contravention of the surplusage canon. With regard to the associated-words canon, the most important commonality shared by the words "law," "regulation," "rule," "ordinance," and "act of Congress" is that each is enacted by a body acting in a legislative or quasi-legislative manner. The list of violations under the WPA includes only written law; in contrast, common law has long been considered unwritten law. Each violation in the statute is the product of legislative lawmaking, and so application of the associated-words canon led to the conclusion that the Legislature did not intend for judge-made common law to form the basis of a claim under the

WPA.  Additionally, the violations of law identified in the WPA are static, while the common law is not; common law lacks the discreteness of positive law and evolves.  Finally, the United States Supreme Court addressed language in *Sprietsma v Mercury Marine*, 537 US 51 (2002), that was similar to the language at issue in this case and held that it did not encompass common-law claims.  The majority improperly held that the common law is "a law" under the WPA and exponentially expanded the violations that the Legislature intended employees to be able to report without fear of losing employment.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

FILED April 14, 2025

STATE OF MICHIGAN

SUPREME COURT

JAMES STEFANSKI,

Plaintiff-Appellant,

v                                                          No. 166663

SAGINAW COUNTY 911
COMMUNICATIONS CENTER
AUTHORITY,

Defendant-Appellee.

BEFORE THE ENTIRE BENCH

CLEMENT, C.J.

This case involves the Whistleblowers' Protection Act (the WPA), MCL 15.361 *et seq.*, specifically MCL 15.362. At issue is whether reporting a violation of the common law, including gross negligence, is a protected activity under MCL 15.362 and whether defendant was entitled to summary disposition on the basis that plaintiff did not engage in a protected activity under the WPA. We hold that the term "law" as used in the statutory

phrase "a violation or a suspected violation of a law" encompasses the common law. MCL 15.362. However, we remand this case to the Court of Appeals for consideration of whether gross negligence is a violation of "a" law and whether plaintiff's actions constituted a "report" under the WPA. These questions were not resolved by the Court of Appeals and were not fully briefed in this Court. Therefore, we reverse the Court of Appeals' decision and remand this case to the Court of Appeals for further proceedings that are consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, James Stefanski, is a former employee of defendant, Saginaw County 911 Communications Center Authority (Saginaw County 911). Stefanski was hired by defendant as a 911 dispatcher trainee in 2012 and was promoted to a full-time dispatcher in 2013. Stefanski remained in this position until November 2021 when he resigned after being suspended without pay for 90 days. The reason given for this suspension was that Stefanski had a pattern of excessive nonscheduled absences (NSAs). Stefanski believed that this reason was pretextual and that the actual reason for the suspension was his disagreement with his supervisors regarding a July 2021 911 call (the Burnham call).

The details of the Burnham call are largely undisputed. At approximately 4:25 a.m. on July 5, 2021, supervisor Logan Bissell answered a 911 call. The caller, who lived on Burnham Street in Saginaw, reported that she had heard three gunshots and that there was a woman yelling outside to call 911. The caller, as well as someone in the background of the call, indicated that they believed that the woman outside had been shot. The coding of calls is discretionary, and Bissell coded the call as a "1010J," which indicates that shots

2

had been fired. According to Stefanski, emergency medical services are not dispatched when a call is coded this way, so emergency medical services were not sent to the scene after this initial call. Stefanski was not present when this initial call was taken; however, he arrived to work shortly thereafter around 5:25 a.m.

At approximately 5:50 a.m., a different employee answered another call placed by the Burnham Street caller. The caller stated that the woman was lying on her porch, that she did not know if the woman was breathing, and that the police had not arrived. The call taker yelled to the dispatcher who was overseeing the city's law-enforcement radio and asked for an update on the Burnham shooting. The dispatcher answered that she did not have a shooting on Burnham Street, only a shots-fired incident. Emergency medical services were then sent to the scene. When they arrived, the woman who had been shot was in full cardiac arrest, and she died shortly thereafter from her injuries.

Later that morning, Stefanski and other employees reviewed the call notes. Stefanski believed that the Burnham call had been improperly coded. In his view, the call should have been coded as a "40J," which would have indicated that someone was shot and required that emergency medical services be dispatched to the scene. Stefanski testified that he did not understand why the call was coded as "shots fired," which does not require that emergency medical services be dispatched to the scene, when the caller stated that she believed someone had been shot. Stefanski and others pressured a supervisor to review the audio recording of the call. The supervisor reviewed the audio recording and stated that he did not hear anything out of the ordinary. When Stefanski questioned the supervisor's conclusion, the supervisor allegedly became angry and told him and others to "let it go."

3

In the following days, Stefanski and others continued to question the events of the Burnham call and how it had been handled by supervisors. During this time, Stefanski listened to the audio recording of the call, which he believed confirmed his opinion that Bissell had improperly coded the call, despite the supervisor's conclusion to the contrary. After an internal investigation, it was determined that Bissell's actions were not negligent and that his coding of the call was a "judgment call." Stefanski disagreed with this determination. He testified that he suspected that the supervisors were covering for each other. Stefanski was upset by this incident because he had heard on the news that law enforcement was being blamed for the delayed response and the victim's death. In his view, law enforcement was not responsible for the delayed response—the alleged improper coding was.

During the last week of July 2021, Stefanski expressed his views to Daniel Weaver, director of Saginaw County 911. Stefanski testified that during this conversation he questioned how they could let the police "take the fall" for this. He also told Weaver that the call was unambiguous and that "there's absolutely no way that you can get that there was not somebody shot on Burnham Street." He asked Weaver what was going to happen with Bissell. In response, Weaver reiterated that this was a judgment call and that he would not question Bissell's decision.

In the weeks that followed, Stefanski missed several days of work. On August 2, 2021, he received and signed a Level 1 NSA notice. This notice is sent after an employee accrues five NSAs. On August 16, 2021, Stefanski received a Level 2 NSA notice. This notice is sent after an employee accrues seven NSAs. After receiving this second notice, Stefanski initiated another conversation with Weaver. During the conversation, Weaver

4

advised Stefanski that he did not want him to revert to his "old ways" regarding the accumulation of NSAs. Stefanski told Weaver that he was having medical issues, including chest pain, and that he was having a lot of stress and anxiety because of the job. He testified that he told Weaver that the increased stress and anxiety was because of the Burnham call, Bissell's gross negligence, and how this matter had been dismissed. Stefanski stated that part of his issue was that if Bissell was not a supervisor, but instead a regular employee like Stefanski, then Bissell would have been subject to discipline in some way, e.g., a suspension, a write-up, termination, or retraining. Stefanski further told Weaver that he viewed the supervisors as a "boys club" and that the handling of the Burnham call was causing a morale issue. He told Weaver that he "felt the urge to go to the Board with the issue" because it was not being handled internally. Stefanski testified that Weaver told him that he did not want to talk about the issue and that their conversation was over.

Subsequently, Stefanski alleges, he was treated differently at work. He claims that he "got shafted in the hallway" and was never called into the director's office unless it was to talk about the NSA policy. Additionally, he testified that he was no longer greeted by supervisors in the morning, that he received "crappy" assignments, and that he was given desk assignments that he did not want.

In October, Stefanski went on a medical leave of absence and was given a return-to-work date of November 10. However, on November 10 he was still sick, so he called out for his November 10 and November 11 shifts. On November 12, Weaver called Stefanski and told him to not report for his shift. On November 15, Weaver called Stefanski and informed him that the call was a disciplinary hearing and that all potential discipline was "on the table," including a write-up, suspension, and termination. Among other things,

5

Stefanski and Weaver discussed his absences and photographs that were posted on his social media on the days he called off work. On November 18, Stefanski received a letter indicating that he was being placed on a 90-day unpaid suspension because of his NSAs.[1]

Believing that the reason for his suspension was pretextual, Stefanski resigned and filed the present suit. He alleged that, in violation of MCL 15.362, Saginaw County 911 constructively discharged him in retaliation for his report to Weaver that Bissell's actions constituted gross negligence and that this violation of the common law was a violation of Michigan law under the WPA.

Saginaw County 911 moved for summary disposition under MCR 2.116(C)(8) and (C)(10), arguing that Stefanski did not engage in activity protected by the WPA because gross negligence is not a violation of a law or regulation or rule promulgated pursuant to law. Saginaw County 911 further argued that even if a report of gross negligence were actionable under the WPA, Stefanski did not make a report or a threat to report under the statute because he did not indicate that Bissell's conduct violated a law, he did not report any hidden violation of the law, and he did not make a charge of illegality. The trial court granted summary disposition to Saginaw County 911, concluding that reporting an employee's perceived negligence or gross negligence—a violation of the common law— was not a protected activity under the WPA.

---

[1] The letter states that Stefanski accumulated 14 total NSAs for 2021 and that according to Saginaw County 911's NSA policy, discipline would need to be administered. Additionally, the letter notes that the number of NSAs accumulated by Stefanski was part of a pattern observed over two years and that he repeatedly failed to properly communicate about these absences.

Stefanski appealed, and the Court of Appeals affirmed in an unpublished per curiam opinion. See *Stefanski v Saginaw Co 911 Communications Ctr Auth*, unpublished per curiam opinion of the Court of Appeals, issued January 4, 2024 (Docket No. 364851). In affirming the trial court's ruling, the Court of Appeals relied on *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 532-533; 854 NW2d 152 (2014). In that case, the Court of Appeals concluded that the plaintiff's report of malpractice did not fall under the WPA. *Id*. at 532. Applying *Landin* to the present case, the Court of Appeals concluded that reporting a violation of the common law is not a protected activity under the WPA. *Stefanski*, unpub op at 5-6. Thus, the Court of Appeals held that Stefanski was not engaging in a protected activity when he allegedly reported Bissell's gross negligence. *Id*.

Stefanski sought leave to appeal in this Court. We ordered oral argument on the application, directing the parties to address:

> (1) whether reporting a violation of the common law, including gross negligence, constitutes reporting "a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law . . ." under MCL 15.362 of the Whistleblowers' Protection Act ("WPA"); and (2) whether the appellee was entitled to summary disposition on the basis that the appellant did not engage in a protected activity under the WPA, MCL 15.362. [*Stefanski v Saginaw Co 911 Communication Ctr Auth*, ___ Mich ___, ___; 10 NW3d 843, 843 (2024).]

## II. LEGAL BACKGROUND

### A. STANDARD OF REVIEW

This case requires the Court to interpret MCL 15.362. We review de novo questions of statutory interpretation. *Iliades v Dieffenbacher North America Inc*, 501 Mich 326, 335; 915 NW2d 338 (2018). Plaintiff argues that the Court of Appeals erred by affirming the trial court's grant of summary disposition to defendant. We also review de novo a trial

7

court's decision to grant or deny a motion for summary disposition. *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95, 109; 1 NW3d 44 (2023).

## B.  STATUTORY BACKGROUND

The WPA was enacted in 1981.  "The underlying purpose of the act is protection of the public." *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 378-379; 563 NW2d 23 (1997).  The WPA furthers this goal by protecting "employees who report a violation or suspected violation of state, local, or federal law[.]"  1980 PA 469, title.  By shielding employees from retaliation, the WPA incentivizes them to assist law enforcement and to alert the public to corrupt or criminally irresponsible behavior. *Dolan*, 454 Mich at 378, 381.  "Among other things, the WPA makes it illegal for an employer to retaliate against an employee because the employee has reported a violation of the law." *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 396; 572 NW2d 210 (1998).  Because the WPA is a remedial statute, courts must construe it liberally to effectuate its purpose of protecting whistleblowers. *Id*. at 406.

Plaintiff's claim was brought under MCL 15.362, which provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, *reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body*, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.  [Emphasis added.]

To establish a prima facie case under this section, "a plaintiff need only show that (1) he or she was engaged in protected activity as defined by the act, (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action." *Whitman v City of Burton*, 493 Mich 303, 313; 831 NW2d 223 (2013). "Protected activity" includes "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler*, 456 Mich at 399.

### III. ANALYSIS

At issue is whether the statutory phrase "a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States" includes a violation of the common law. MCL 15.362. When interpreting a statute, this Court "must ascertain the legislative intent that may reasonably be inferred from the words in a statute." *People v Couzens*, 480 Mich 240, 249; 747 NW2d 849 (2008). "If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning and we enforce the statute as written." *People v Weeder*, 469 Mich 493, 497; 674 NW2d 372 (2004).

When a statutory definition is absent, the Court begins with consulting dictionary definitions to determine a word's plain and ordinary meaning. *People v Wood*, 506 Mich 114, 122; 954 NW2d 494 (2020). A lay dictionary may be used when defining common words or phrases. *People v Thompson*, 477 Mich 146, 151; 730 NW2d 708 (2007). "A legal term of art, however, must be construed in accordance with its peculiar and

9

appropriate legal meaning." *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008). Stefanski argues that a violation of the common law is a violation of a law under MCL 15.362. Because the WPA does not define "law," we turn to dictionary definitions to ascertain the word's plain meaning.

We conclude that "law," when given its plain meaning as found in a lay dictionary, includes the common law. The most relevant definition of "law" in *Webster's New Collegiate Dictionary* (8th ed) is "(1): a binding custom or practice of a community . . . (2): the whole body of such customs, practices, or rules (3): COMMON LAW . . . ." (Emphasis added.) The definition of "law" in *Webster's New World Dictionary* (2d ed) also includes the common law: "**6.** common law, as distinguished from equity . . . ." Thus, the common law clearly fits within the meaning of "law" found in lay dictionaries.[2]

Even if "law" is considered a term of art, the common law is also included in the legal meaning of "law." "Law" as defined in *Black's Law Dictionary* (5th ed) encompasses the common law: "[t]hat which is laid down, ordained, or established. . . . Law, in its generic sense, is a body of rules of action or conduct prescribed by controlling authority, and having binding legal force." Further, this Court has explained that the common law is " 'a flexible body of principles' " that is the law of our state. *Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 430; 157 NW2d 213 (1968), quoting 15A CJS,

---

[2] See also *The Oxford English Dictionary* (1978) ("1. The body of rules, whether proceeding from formal enactment or from custom, which a particular state or community recognizes as binding on its members or subjects. . . . 5. In English technical use applied in a restricted sense to the Statute and Common Law, in contradistinction to EQUITY. . . . 8. The action of the courts of law, as a means of procuring redress of grievances or enforcing claims; judicial remedy."); *Collins Concise Dictionary of the English Language* (1978) ("**6.** common law, as distinguished from equity").

10

Common Law, § 2, pp 43-44. It is judge-made law that develops incrementally through judicial decisions that resolve individual disputes. *Woodman v Kera LLC*, 486 Mich 228, 267-268; 785 NW2d 1 (2010) (opinion by MARKMAN, J.). This Court's authority to develop the common law can be traced to our Constitution, which gives legal force to such decisions. *Id*. at 269; Const 1963, art 3, § 7. Accordingly, the common law meets the definition of "law" found in *Black's Law Dictionary* (5th ed) because it is a body of rules that is developed by the judiciary, a controlling authority, and it has binding legal force.

In sum, the word "law" as used in MCL 15.362 encompasses the common law, whether understood as a term of art or in its ordinary sense.[3] This interpretation aligns with the WPA's broader purpose of public protection, which is achieved "by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law." *Dolan*, 454 Mich at 378-379. MCL 15.362 does not limit the word "law." It does not say "statutory law" or "constitutional law"; it merely states "a law."[4] As explained, the plain and ordinary definition of "law"

---

[3] The dissent points to *Reading Law* to argue that our reading "flies in the face of the surplusage canon . . . ." The authors of *Reading Law* acknowledge that this canon, like any canon, cannot always be dispositive because occasionally drafters include repetitive language—a "belt-and-suspenders approach," so to speak. Scalia & Garner, *Reading Law*: *The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 176-177. In any event, we disagree with the dissent's argument that our reading duplicates the phrase "regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States." While the definitions of "regulation" and "rule" might have substantial overlap with the definition of "law," they are each separate concepts. Despite the similarities in the definitions, the Legislature included each term, and we must enforce the statute as written. See *Dep't of Agriculture v Appletree Mktg, LLC*, 485 Mich 1, 8; 779 NW2d 237 (2010).

[4] The dissent argues that the WPA only includes violations of written law. It does so by looking to the phrase "regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States." Invoking the *noscitur a sociis*

11

encompasses the common law. The statutory interpretation of the WPA urged by Saginaw County 911 would exclude a large subset of law, which, in turn, would undermine the WPA's purpose. If we were to exclude the common law from MCL 15.362, we would be imposing a limiting barrier that is not found in the statute. Under this construction, employees would have to worry about whether the law they suspect has been violated is a part of this excluded subset, thus eliminating their access to any protection under the WPA. Such a construction is impermissible and inconsistent with our mandate to liberally construe the WPA as a remedial statute. See *Chandler*, 456 Mich at 406.

---

canon, the dissent concludes that "[t]he most important commonality shared by the words 'law,' 'regulation,' 'rule,' 'ordinance,' and 'act of Congress' is that each is enacted by a body acting in a legislative or quasi-legislative manner." Notwithstanding that the WPA does not specifically list "ordinance" or "act of Congress," we disagree with the dissent's conclusion on this. "The common quality suggested by a listing should be its *most general quality*—the least common denominator, so to speak—relevant to the context." *Reading Law*, p 196 (emphasis added). With that in mind, the most important shared commonality is that laws, regulations, and rules promulgated pursuant to law of this state, a political subdivision of this state, or the United States each can have legal force. See *id*. (rejecting a narrow interpretation of the statutory phrase "[*a*]*cts and ordinances*" as "only laws made by a legislative body" because the "only quality that those words surely have in common is a legally binding effect prescribed by a governmental authority"). Moreover, "[w]hen deciding between textually supportable interpretations, this Court . . . consider[s] which interpretation 'is more consistent with the general legislative plan and purpose.' " *Soaring Pine Capital Real Estate & Debt Fund II, LLC v Park Street Group Realty Servs, LLC*, 511 Mich 89, 129; 999 NW2d 8 (2023) (citation omitted). When laws, regulations, or rules promulgated pursuant to law of this state, a political subdivision of this state, or the United States have legal force, employers are obligated to comply with them, and when they do not, employers engage in corrupt or criminally irresponsible behavior. See *Dolan*, 454 Mich at 378, 381. As discussed, this behavior creates a public harm that the WPA seeks to reduce. While the dissent's interpretation is one potential interpretation, we believe that our interpretation is more aligned with the ordinary meaning of "law," the WPA's overall purpose of public protection, and our mandate that the WPA "be liberally construed to favor the persons the Legislature intended to benefit." *Chandler*, 456 Mich at 406.

12

Therefore, we hold that the word "law," when given its plain and ordinary meaning, includes the common law.[5] Accordingly, we reverse the Court of Appeals' judgment in that regard.

## IV. ISSUES TO BE DECIDED ON REMAND

Our holding that the common law is included in the term "law" as used in MCL 15.362 does not resolve the issue of whether reporting gross negligence is a protected activity under the WPA. Saginaw County 911 argues that under the WPA a plaintiff must report a violation of a singular law and that the common law is not a singular law; rather, the common law is derived from judicial decisions or the accumulation of judicial wisdom. To support its argument, Saginaw County 911 points to the WPA's use of the indefinite article "a" before the word "law": "a violation or a suspected violation of *a* law . . . ." MCL 15.362 (emphasis added).

Because an employee must report a violation of "a" law and not just a violation of law, a plaintiff may not simply report a violation of law generally. Although the common law falls under the definition of "law," to receive the WPA's protections, a plaintiff must show that the reported violation was, in fact, a violation of "a" law. Accordingly, resolving this issue requires the Court to determine whether gross negligence is, in and of itself, "a" law that can be, and was, violated. This issue was not previously addressed by the Court of Appeals, so we remand this issue to the Court of Appeals for resolution.[6]

---

[5] Because we hold that the common law is included in the plain and ordinary definition of "law," we find it unnecessary to determine whether the common law is a "regulation or rule" or whether the common law is promulgated pursuant to law.

[6] We note that in *Landin*, the Court of Appeals held that reporting malpractice, a common-law violation, did not fall under the WPA's protections. *Landin*, 305 Mich App at 532.

13

Our holding also does not resolve the issue of whether Saginaw County 911 was entitled to summary disposition on the basis that Stefanski did not engage in a protected activity under the WPA. MCL 15.362 protects an employee who "reports or is about to report . . . a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state . . . ." MCL 15.362. Accordingly, to receive protection under the WPA, a plaintiff must show that he, in fact, made a report or must show by clear and convincing evidence that he was about to make a report. *Chandler*, 456 Mich at 400; MCL 15.363(4). The act does not protect employees who merely discuss reporting a violation without taking further action. *Chandler*, 456 Mich at 402.

Neither the trial court nor the Court of Appeals determined whether Stefanski's actions constituted a report or otherwise demonstrated that he was about to make a report under the WPA. The lower courts' decisions relied on the conclusion that reporting a violation or suspected violation of the common law is not a protected activity under the WPA, so the lower courts did not reach this issue. Because this issue was not previously

Here, the Court of Appeals found the facts of *Landin* to be directly on point to the facts of this case because malpractice is also a type of negligence. *Stefanski*, unpub op at 5-6. However, we note that the *Landin* Court did not address the broader issue of whether reporting a violation of the common law is protected under the WPA and that its analysis of whether reporting malpractice was protected under the WPA was scant. Having concluded that the common law is included in the definition of "law," we decline to address *Landin* further because the main issue in *Landin* is not dispositive to this case. Although malpractice and gross negligence are related, they are different concepts, so the continued applicability of *Landin*'s holding is not solely dependent on the Court's decision on remand. While the dissent might find such a directive problematic, given that we are not weighing in on the specific common-law violation alleged in this case, it is only appropriate to now remand this case for the Court of Appeals to make such a determination with the note that *Landin* is not dispositive.

14

addressed by the Court of Appeals, we also remand this issue to the Court of Appeals for it to resolve whether Stefanski satisfied this required element of his claim.

## V. CONCLUSION

In sum, to receive protection under MCL 15.362, an employee must report a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law. When given its plain and ordinary meaning, the term "law" includes the common law. Accordingly, we reverse the Court of Appeals' decision. Additionally, we remand this case to the Court of Appeals for consideration of whether gross negligence is a violation of "a" law and whether plaintiff's conduct constituted a report under MCL 15.362.

Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

STATE OF MICHIGAN

SUPREME COURT

JAMES STEFANSKI,

               Plaintiff-Appellant,

v                                               No. 166663

SAGINAW COUNTY 911
COMMUNICATIONS CENTER
AUTHORITY,

               Defendant-Appellee.

---

ZAHRA, J. (*dissenting*).

The majority opinion distorts the statutory phrase "a violation or a suspected violation of a law"[1] under the Whistleblowers' Protection Act (the WPA)[2] by myopically focusing on generic dictionary definitions of the word "law" to hold that the WPA "encompasses the common law." I do not undervalue or criticize the use of dictionaries as a tool to interpret statutes. But dictionaries should be used in conjunction with fundamental principles of statutory construction. One such fundamental principle is that the words of the text reign supreme, and what those words convey, *in their context*, is what the text means.[3]

---

[1] MCL 15.362.

[2] MCL 15.361 *et seq*.

[3] See Scalia & Garner, *Reading Law*: *The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 55.

The majority opinion cherry-picks the word "law" from the WPA and defines it in isolation from the statutory text that more specifically refers to "a law," which "implies a discreteness . . . that is not present in the common law."[4]  The majority also cherry-picks the phrase "common law" from the definitions of "law" found in the various dictionaries that it cites without consideration of the statutory language surrounding the word "law," which not only refers to a violation of "a law" but also violations of a "regulation" or a "rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States . . . ."  These specific violations, when used together, indicate that the Legislature is referring to only positive enactments of law rather than the common law.[5]

The majority opinion runs afoul of two applicable canons of statutory construction: the surplusage canon and the associated-words canon.  A proper application of these canons requires that the word "law" be interpreted in context and in conjunction with the text "*a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States*"[6] as used in the

---

[4] *Sprietsma v Mercury Marine*, 537 US 51, 63; 123 S Ct 518; 154 L Ed 2d 466 (2002).

[5] *Id.*

[6] MCL 15.362 (emphasis added).  A law promulgated pursuant to law of "a political subdivision of this state" plainly refers to an ordinance, which *Black's Law Dictionary* (12th ed) defines as

> [a]n authoritative law or decree; specif., a municipal regulation, esp. one that forbids or restricts an activity. • Municipal governments can pass ordinances on matters that the state government allows to be regulated at the local level. A municipal ordinance carries the state's authority and has the same effect within the municipality's limits as a state statute.

2

WPA. Interpreting this phrase through the application of the two longstanding canons of construction, I easily conclude that a violation or suspected violation of "a law" under MCL 15.362 refers to a violation or suspected violation of a statute, administrative rule, and perhaps a constitutional provision, but not the common law. Accordingly, I dissent.

## I. ANALYSIS

The provision at issue under the WPA is MCL 15.362, which provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, *a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body*, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [Emphasis added.]

## A. THE SURPLUSAGE CANON

The majority opinion defines law according to the following sources, stating:

> The most relevant definition of "law" in *Webster's New Collegiate Dictionary* (8th ed) is "(1): a binding custom or practice of a community . . . (2): the whole body of such customs, practices, or rules (3): COMMON LAW . . . ." (Emphasis added.) The definition of "law" in *Webster's New World Dictionary* (2d ed) also includes the common law: "6. common law, as distinguished from equity . . . ." Thus, the common law clearly fits within the meaning of "law" found in lay dictionaries.

> Even if "law" is considered a term of art, the common law is also included in the legal meaning of "law." "Law" as defined in *Black's Law Dictionary* (5th ed) encompasses the common law: "[t]hat which is laid

---

A law promulgated pursuant to law of "the United States" plainly refers to acts of Congress. See *id.* (defining "act of Congress").

3

down, ordained, or established. . . . Law, in its generic sense, is a body of rules of action or conduct prescribed by controlling authority, and having binding legal force." [Citation and boldface omitted.]

The majority opinion's generic definition of "law" includes not only "common law" but also regulations, rules, ordinances, and acts of Congress. If the majority's definition of "law" is accurate in this context, there would be absolutely no reason for the statute to further enumerate violations of a "regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States . . . ." Simply put, the majority's definition of "law" is so broad that the entire remaining phrase, "regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States," becomes unnecessary and dead letter, in contravention of the surplusage canon. The surplusage canon provides that, "[i]f possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."[7] Particularly apt here is that " 'courts must . . . lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.' "[8] The majority opinion's expansive interpretation of the word "law" duplicates the phrase "regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States" in MCL 15.362.[9] Such an interpretation flies in the face of the surplusage canon and must be rejected.

---

[7] *Reading Law*, p 174 (citation and boldface omitted).

[8] *Id*., quoting Cooley, Constitutional Limitations (1868), p 58.

[9] See *Reading Law*, p 174. The majority's response to this conclusion is telling. The majority unnecessarily points out that the surplusage canon may not apply in some cases

4

## B. THE ASSOCIATED-WORDS CANON

The interpretation embraced in the majority opinion is also so generic that it fails to provide context to the pertinent provisions of the WPA. Reading the statute as a whole, as we must,[10] it is clear that the statute identifies different violations of law. "Because [c]ontext is a primary determinant of meaning, we must always read the text as a whole, in view of its structure and of the physical and logical relation of its many parts."[11] And "[a]ssociated words bear on one another's meaning (*noscitur a sociis*)."[12] This Court has

---

"because occasionally drafters include repetitive language[.]" This dissent does not suggest that *the drafters* included repetitive language in MCL 15.362. The drafters certainly did not. Rather, it is *the majority's* generic interpretation of "a law" that not only provides "substantial overlap" with a "regulation" and a "rule" but, in fact, encompasses those terms and thus runs afoul of the surplusage canon.

Here, the dissent examines the full context of the pertinent text of the WPA, cites several interpretive clues—the surplusage canon, the associated-words canon, and *Sprietsma*, a unanimous opinion of the Supreme Court of the United States that addressed language that is strikingly similar to the language now before this Court—and squarely concludes that the majority's interpretation in this case is wrong. In contrast, the majority opinion looks only to generic definitions of "law" from various dictionaries to conclude that its "interpretation is more aligned with the ordinary meaning of 'law[.]' " This conclusion misses the mark because it is unsupported by directly applicable, longstanding principles of statutory interpretation and it fails to account for—or in any way address— highly persuasive caselaw from the Supreme Court of the United States.

[10] See *Daher v Prime Healthcare Servs-Garden City, LLC*, ___ Mich ___, ___; ___ NW3d ___ (July 30, 2024) (Docket No. 165377); slip op at 5. See also *Clam Lake Twp v Dep't of Licensing & Regulatory Affairs*, 500 Mich 362, 373; 902 NW2d 293 (2017) ("The statute must be considered as a whole, reading individual words and phrases in the context of the entire legislative scheme. Unambiguous statutes are enforced as written.") (quotation marks and citation omitted).

[11] *Daher*, ___ Mich at ___; slip op at 5 (quotation marks and citation omitted; alteration in original).

[12] *Reading Law*, p 195 (boldface omitted).

long recognized and used the associated-words canon, explaining that "words in a statute should not be construed in the void, but should be read together to harmonize the meaning, giving effect to the act as a whole."[13] The associated-words canon recognizes that "[a]lthough a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context."[14] "The Latin phrase *noscitur a sociis* means 'it is known by its associates'—a classical version, applied to textual explanation, of the observed phenomenon that birds of a feather flock together."[15] So, "[w]hen several nouns or verbs or adjectives or adverbs—any words—are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar. The canon especially holds that 'words grouped in a list should be given related meanings.' "[16]

The most important commonality shared by the words "law," "regulation," "rule," "ordinance," and "act of Congress" is that each is enacted by a body acting in a legislative or quasi-legislative manner.[17] And because the statute refers to "a law" in the singular,

---

[13] *Gen Motors Corp v Erves (On Rehearing)*, 399 Mich 241, 255; 249 NW2d 41 (1976) (opinion by COLEMAN, J.).

[14] *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003).

[15] *Reading Law*, p 195.

[16] *Id*. (citation omitted).

[17] The majority opinion notes that " '[t]he common quality suggested by a listing should be its *most general quality*—the least common denominator, so to speak—relevant to the context.' " (Quoting *Reading Law*, p 196; emphasis by the majority opinion.) The majority suggests that these words more commonly refer to an amorphous "legal force," which is such an overly basic commonality that it fails to provide any meaningful connection or distinction.

instead of "the law," such usage alone suggests that the Legislature meant a particular violation of "law," as opposed to a transgression of the collective common law. Indeed, the Supreme Court of the United States addressed similar language in *Sprietsma v Mercury Marine*.[18] There, the Court addressed the express preemption clause in 46 USC 4306. The actual language of that provision states, in part, that "a State or political subdivision of a State may not establish, continue in effect, or enforce a law or regulation . . . ."[19] The United States Supreme Court held that this

> pre-emption clause . . . applies to "a [state or local] law or regulation." 46 U.S.C. § 4306. . . . [T]his language is most naturally read as not encompassing common-law claims for two reasons. First, the article "a" before "law or regulation" implies a discreteness—which is embodied in statutes and regulations—that is not present in the common law. Second, because "a word is known by the company it keeps," . . . the terms "law" and "regulation" used together . . . indicate that Congress pre-empted only positive enactments.[20]

Relying on *Sprietsma*, our Court of Appeals held that "[t]he Legislature's use of the phrase '[a]ny other law' [in MCL 432.203(3) of the Michigan Gaming Control and Revenue Act, MCL 432.201 *et seq*.] implies that the preemption clause is all-inclusive when referring to the laws it was meant to encompass. That the phrase '[a]ny other law' sweeps broadly suggests that the Legislature meant to include common law in addition to

---

[18] *Sprietsma*, 537 US 51.

[19] 46 USC 4306.

[20] *Sprietsma*, 537 US at 63, quoting *Gustafson v Alloyd Co, Inc*, 513 US 561, 575; 115 S Ct 1061; 131 L Ed 2d 1 (1995).

7

legislative enactments."[21] The language at issue in this case is not nearly as "sweeping" as the phrase "[a]ny other law" and certainly has more discreteness as it enumerates more particular types of positive law than, for instance, "a law or regulation," which is the very language *Sprietsma* held did not encompass common-law claims.

Taken together, the list of violations under the WPA includes only "written law," which consists of

> [s]tatutory law, together with constitutions and treaties, as opposed to judge-made law. . . .
>
> "Traditionally, statutes and precedents were considered to be very different types of law. Statutes have always been thought of as 'written law.' Because they are written, their text tends to be analyzed very closely. [¶ ] Precedents contained in judicial opinions have traditionally been considered 'unwritten law' because long ago judges simply read or announced their decisions from the bench, without writing them down." Bryan A. Garner et al., *The Law of Judicial Precedent* 1 (2016).[22]

In contrast, the common law has long been considered "unwritten law," which is

> [a] rule, custom, or practice that has not been enacted in the form of a statute or ordinance. • The term traditionally includes caselaw. Hence there certainly is a written memorial of the "unwritten law." The phrase simply denotes that this law does not originate in a writing such as a statute. . . .
>
> "[T]he very words of the court promulgating the opinion and making the decision do not determine absolutely the rule of law but . . . the rule of law is ascertained by discovering what general proposition was essential to the result reached, and by using the words of the opinion as a mere aid in the ascertaining of that rule, so that, although opinions are written, the authoritative rules derived from them are sometimes not written, but are ascertained by the use of reason, causing case law to be classed as unwritten

---

[21] *Kraft v Detroit Entertainment, LLC*, 261 Mich App 534, 546; 683 NW2d 200 (2004).

[22] *Black's Law Dictionary* (12th ed), p 1055 (defining "written law") (second alteration in original).

law — *lex non scripta*, to use the Latin phrase." William M. Lile et al., *Brief Making and the Use of Law Books* 335 (Roger W. Cooley & Charles Lesley Ames eds., 3d ed. 1914).

> "In the common law it is not too much to say that the judges are always ready to look behind the words of a precedent to what the previous court was trying to say, or to what it would have said if it could have foreseen the nature of the cases that were later to arise, or if its perception of the relevant factors in the case before it had been more acute. There is, then, a real sense in which the written words of the reported decisions are merely the gateway to something lying behind them that may be called, without any excess of poetic license, 'unwritten law.'" Lon L. Fuller, *Anatomy of the Law* 145 (1968).[23]

Here, MCL 15.362 clearly distinguishes between "written" and "unwritten" law. Given that each violation in the statute is the product of legislative lawmaking, application of the associated-words canon informs us that the Legislature did not intend for judge-made common law to form the basis of a claim under the WPA.

This makes sense given that "common law" is commonly defined as "the body of law developed in England primarily from judicial decisions based on custom and precedent, unwritten in statute or code, and constituting the basis of the English legal system and of the system in all of the U.S. except Louisiana."[24] *Black's Law Dictionary* (12th ed) provides additional insight in understanding the "common law":

> "Historically, [the common law] is made quite differently from the Continental code. The code precedes judgments; the common law follows them. The code articulates in chapters, sections, and paragraphs the rules in accordance with which judgments are given. The common law on the other hand is inarticulate until it is expressed in a judgment. Where the code governs, it is the judge's duty to ascertain the law from the words which the code uses. Where the common law governs, the judge, in what is now the

---

[23] *Id*. (defining "unwritten law").

[24] *Merriam-Webster's Collegiate Dictionary* (11th ed).

9

forgotten past, decided the case in accordance with morality and custom and later judges followed his decision. They did not do so by construing the words of his judgment. They looked for the reason which had made him decide the case the way he did, the *ratio decidendi* as it came to be called. Thus it was the principle of the case, not the words, which went into the common law. So historically the common law is much less fettering than a code." Patrick Devlin, *The Judge* 177 (1979).[25]

Moreover, the violations of law identified in the WPA are static, while the common law is not. In *Price v High Pointe Oil Co, Inc*,[26] this Court stated:

> As this Court explained in *Bugbee v Fowle*, the common law " 'is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes[.]' " *Bugbee v Fowle*, 277 Mich 485, 492; 269 NW 570 (1936), quoting *Kansas v Colorado*, 206 US 46, 97; 27 S Ct 655; 51 L Ed 956 (1907). The common law, however, is not static. By its nature, it adapts to changing circumstances. See Holmes, *The Common Law* (Mineola, New York: Dover Publications, Inc., 1991), p 1 (noting that the common law is affected by "[t]he felt necessities of the time, the prevalent moral and political theories, [and] intuitions of public policy" and that it "embodies the story of a nation's development through many centuries"). And as this Court stated in *Beech Grove Investment Co v Civil Rights Comm*:
>
>> It is generally agreed that two of the most significant features of the common law are: (1) its capacity for growth and (2) its capacity to reflect the public policy of a given era. . . .
>>
>> * * *
>>
>> "The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law, but it is a flexible body of principles which are designed to meet, and are susceptible of adaption to, among other things, new institutions, public policies, conditions, usages and practices, and changes in mores, trade, commerce, inventions,

---

[25] *Black's Law Dictionary* (12th ed), p 348 (alteration in original).

[26] *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 242-243; 828 NW2d 660 (2013) (alterations in original).

and increasing knowledge, as the progress of society may require. So, changing conditions may give rise to new rights under the law . . . ." [*Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 429-430; 157 NW2d 213 (1968), quoting 15A CJS, Common Law, § 2, pp 43-44.]

The common law is always a work in progress and typically develops incrementally, i.e., gradually evolving as individual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of changing times and circumstances.

The majority plainly disregards that the Legislature contemplated written and static law and did not consider violations of judicially created common law. As noted by amicus curiae, the Michigan Defense Trial Counsel, Inc., "[t]he common law, however, is anything but concrete and knowable. It is a slurry of every judge's rulings."[27] Amicus notes that Roscoe Pound wrestled to describe the common law's metes and bounds in his seminal work, *What is the Common Law*:

"From one standpoint we may think of the common law as a system— as an organized body of doctrines and principles, and even to some extent still of rules for the adjustment of relations and ordering of conduct. From another standpoint we may think of it as a tradition—either as a tradition of deciding, so far as tribunals are free to decide, or as a tradition of teaching and writing. From yet another standpoint we may think of it as a frame of mind—as the frame of mind, or perhaps better as a manifestation of the frame of mind, of a masterful people which has made its way in every quarter of the earth and yet has always imposed upon itself limitations of free action while still seeking to be free through requiring reasoned adherence to principles on the part of those who wield governmental authority over it."[28]

For these reasons, I agree with amicus

---

[27] Brief for the Michigan Defense Trial Counsel, Inc., as Amicus Curiae (December 4, 2024) (Docket No. 166663) at 11.

[28] *Id*., quoting Pound, *What Is the Common Law*, 4 U Chicago L Rev 176, 181 (1937).

11

that employers will not understand what the common law requires and neither will employees. Employers will be undeterred; employees will remain timid; the public will be endangered. If this Court agrees . . . that neither employers nor employees have a good grasp of the common law, then it should also agree that interpreting the word "law" to include the common law will not serve the WPA's purpose of protecting the public by deterring employers and emboldening employees.[29]

The majority opinion's remand directive is also problematic. Specifically, this Court directs the Court of Appeals "to determine whether gross negligence is, in and of itself, 'a' law . . . ." Significantly, in *Landin v Healthsource Saginaw, Inc*,[30] the Court of Appeals addressed whether a hospital could be held liable under a public-policy claim for terminating an employee allegedly in retaliation to his reporting a colleague's medical malpractice to a supervisor. The hospital argued that the employee's claim was not a cognizable public-policy claim and instead fell squarely within the WPA because MCL 333.20180(1) of the Public Health Code, MCL 333.1101 *et seq*., expressly provides that " 'a report or complaint of a violation of [the Public Health Code] or a rule promulgated under [the Public Health Code] . . . is protected under the [WPA].' " The panel rejected this argument, highlighting that the employee had not alleged "a" violation of law but had instead alleged that his colleague had committed medical malpractice. Thus, standing alone and without reliance on "a" particular law, a claim alleging that another employee had committed medical malpractice does not fall under the WPA's protections.[31] Here, the

---

[29] Brief for the Michigan Defense Trial Counsel, Inc., as Amicus Curiae (December 4, 2024) (Docket No. 166663) at 11.

[30] *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 521-522; 854 NW2d 152 (2014).

[31] *Landin*, 305 Mich App at 532-533.

12

Court of Appeals found the facts of *Landin* to be directly on point to the facts of this case because malpractice is also common-law negligence.[32]

The *Landin* panel did not address the broader issue of whether reporting a violation of the common law is protected under the WPA, and its analysis of whether reporting malpractice was protected under the WPA was scant. On remand, the Court of Appeals may conclude that despite being part of the common law, gross negligence itself is not "a" law. If this is the case, the Court of Appeals may conclude that plaintiff's alleged reporting of gross negligence was not a report of a violation of *a* law under the WPA. Although malpractice and gross negligence are related, they are different concepts, so the continued applicability of *Landin*'s holding is not solely dependent on the Court's decision on remand.

## II. CONCLUSION

The WPA encourages employees to report "a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body . . . ." MCL 15.362. These violations all commonly share the qualities of positive law and remain static after having been promulgated. In contrast, common law lacks the discreteness of positive law and evolves. In sum, the majority opinion improperly holds that common law is "a law" under the WPA and exponentially expands the violations that the Legislature intended employees to be able to report without fear of losing employment. For the reasons outlined in this opinion, I dissent.

Brian K. Zahra

---

[32] *Stefanski v Saginaw Co 911 Communications Ctr Auth*, unpublished per curiam opinion of the Court of Appeals, issued January 4, 2024 (Docket No. 364851), pp 5-6.